J-A20029-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: G.W.C., A MINO | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: T.F.C. | : | |
| | : | |
| | : | |
| | : | No. 125 WDA 2016 |

Appeal from the Order Entered December 18, 2015
in the Court of Common Pleas of Bedford County
Orphans' Court at No: 23 Adoption 2012

BEFORE:  BOWES, STABILE, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 11, 2016**

T.F.C. ("Father") appeals from the December 18, 2015 order that involuntarily terminated his parental rights to his son, G.W.C., born in July of 2009 ("Child").  Upon careful review, we affirm.

We summarize the procedural posture of this case as follows.  On October 15, 2012, the Bedford County Children and Youth Services ("CYS") filed a petition for the involuntary termination of Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).  By order dated May 23, 2014, following a protracted evidentiary hearing, the orphans' court denied the petition.  On appeals filed by CYS and the Guardian *ad litem* ("GAL"), this Court reversed the order, in part, and remanded the case to

the trial court.[1] ***See In re G.C.***, ____ A.3d _____, 2015 Pa. Super. Unpub. LEXIS 1169 (filed April 29, 2015).  Specifically, this Court concluded that the trial court abused its discretion in failing to terminate Father's parental rights pursuant to Section 2511(a)(2).[2]  We remanded the matter "for the trial court's application of the appropriate standard in its section 2511(b) bond analysis."  ***Id.***  We stated that, "On remand, the trial court may take additional evidence, if necessary, to comply with this directive."  ***Id.***

Following that disposition, on September 24, 2015, the trial court held oral argument with respect to Father's request for a new bonding study and the petition for adoption filed by Child's foster parents, both of which the

_____

[1] In addition, the May 23, 2014 order involuntarily terminated the parental rights of C.C. ("Mother"), which this Court affirmed.  ***See In re G.C.***, ____ A.3d ____, 2015 Pa. Super. Unpub. LEXIS 1169 (filed April 29, 2015).

[2] Section 2511(a)(2) provides as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .

23 Pa.C.S.A. § 2511(a)(2).

court denied. *See* N.T., 9/24/15, at 15, 18-22. By order dated December 18, 2015, without taking additional evidence, the trial court involuntarily terminated Father's parental rights. Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b).

On appeal, Father presents the following issues for our review:

[1.] Whether or not the [t]rial [c]ourt erred or abused its discretion when it determined that CYS established a legal basis for terminating the parental rights of the natural father when there was no evidence presented to the [t]rial [c]ourt that sufficiently demonstrated that the Father could not parent the Child[?]

[2.] Whether the [t]rial [c]ourt properly considered the impact of the termination of [F]ather's rights in accordance with [Section] 2511(b) on [C]hild's emotional well-being, especially in light of the [t]rial [c]ourt's acknowledgment that the bond between [F]ather and [C]hild was not "negative and unhealthy" and that the [t]rial [c]ourt could not "say that the child will not be damaged by terminating the relationship" with [F]ather?

[3.] Whether or not the [t]rial [c]ourt erred or abused its discretion when it declined to order another bonding study because the failure to do so did not provide the [t]rial [c]ourt with an updated perspective on the impact of [F]ather's extensive use of his visitation rights on the bond between [F]ather and [C]hild and the impact of terminating that bond on [C]hild?

Father's brief at 5.

We consider Father's issues mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported

- 3 -

by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

In this case, based on our disposition in *In re G.C., supra*, we review the involuntary termination decree with respect to Section 2511(b) only, which provides:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

This Court has explained as follows.

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa. Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa. Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010),
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of

- 5 -

relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

In addition, in considering the affection a child may have for his or her natural parents, we have explained as follows.

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d at 535 (internal citations and quotation marks omitted).

Moreover, our Supreme Court confirmed that, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *In re T.S.M.*, *supra*. The Court further stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *Id.* at 268. Moreover, the Court directed that, in weighing the bond considerations pursuant to

- 6 -

Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, in our prior disposition, we explained that the trial court denied the involuntary termination of Father's parental rights based, in part, on a "positive bond existing between Father and [Child][,]" *inter alia*. *See In re G.C.*, ___ A.3d at ____. However, we observed the trial court's findings with respect to Dennis Kashurba, a psychologist who performed a psychological bonding study in September 17, 2012, with an addendum in March 19, 2013, and whom the court qualified as an expert in child behavior, as follows.

> [Mr. Kashurba] found that [Child] does have an emotional bond with his biological parents[,] but his bond . . . is at least as strong with the foster parents and probably a stronger bond as he has resided with the foster parents for approximately one-half of his life. Further, greater stability exists with the foster parents. The addendum report of March 19, 2013[,] was based on reports by the [CYS] case supervisor. A review of these documents indicated a behavioral regression on [Child's] part . . . .

*In re G.C.*, ___ A.3d at ____. As such, pursuant to *In re T.S.M.*, *supra*, we concluded in our prior disposition as follows.

> [The trial court] failed to consider and weigh the positive bond it found between Child and the foster parents, and the stability and care provided by the foster parents. The trial court's reliance

upon Father's bond with Child, alone, failed to meet the requirements of section 2511(b).

*In re G.C.*, ___ A.3d at ____.

Turning to Father's first issue on appeal, he asserts that he is able to care for Child, and that he has a positive bond with Child. The crux of his argument is that his conduct does not warrant termination pursuant to Section 2511(a)(2). Based on our prior disposition, wherein we concluded that the trial court abused its discretion in failing to involuntarily terminate his parental rights under Section 2511(a)(2), we do not address Father's first issue. *See In re G.C.*, *supra*.

In his second issue, Father argues that the trial court abused its discretion in terminating his parental rights pursuant to Section 2511(b). Father implies that the court failed to consider that a positive bond exists between him and Child, and the impact on Child of terminating that bond. We disagree.

The testimonial evidence overwhelmingly demonstrates that terminating Father's parental rights will serve the developmental, physical and emotional needs and welfare of Child pursuant to Section 2511(b). Indeed, the record supports the trial court's findings with respect to the testimony of Mr. Kashurba, *supra*. In fact, he testified that Child's "primary parent/child bond appears to be . . . with the foster parents." N.T., 8/7/13, at 105. Mr. Kashurba went on to testify, "that separating the relationship between [Child] and the foster family with whom he's resided for more than

half of his life and where he's received stability would be much more detrimental to him than severing the bond with the biological parents." *Id.* at 107.  He further explained on cross-examination by the GAL:

> There's going to be a severing of a bond regardless of the outcome of the [c]ourt.  It's [sic] been my opinion that the primary emotional bond between child and parents is with the foster parents who at the time of my evaluation were interested in adopting him.  And I noted on page three of my opinion, the on-going uncertainty regarding [his] permanency appears to place him at-risk of serious mental injury in the form of chronic agitation[.]  [The] continuation of [Child's] uncertainty[] [regarding permanency] increases the likelihood that it will seriously interfere with his ability to accomplish age appropriate developmental and social tasks and increase the potential for the development of . . . anxiety and/or depression.

*Id.* at 120.  Significantly, Mr. Kashurba testified that, "I do not believe that severing the bond between the child and his biological parents would have an adverse effect on the child.  On the contrary, I believe the more speedily that that could have been accomplished, the better off [Child] would have been." *Id.* at 94.

In addition, Peggy Nadenichek, a licensed clinical psychologist, performed a bonding assessment in this case on May 29, 2013.  Her testimony was consistent with that of Mr. Kashurba.  On cross-examination by the GAL, she testified as follows.

> Q. [D]o you think it's a healthy bond between Child [and his biological parents]?
>
> A. It's not a strong bond. . . .  There's a bond there.  It's not a strong bond as the bond is with the foster parents. . . .

N.T., 10/8/13, at 78. Further, she testified that, "the longer that [Child] . . . doesn't know who his parents are and what's going on, that's going to be damaging for him." *Id.* at 77.

The opinions of Mr. Kashurba and Ms. Nadenichek are supported by the testimony of Kay Fair, the clinical supervisor and outpatient therapist at the Alternative Community Resource Program, who became Child's therapist in January of 2013, up through and including the time of the termination hearing. Ms. Fair testified that she was treating Child for "problems that he has related to visitation with his biological parents." N.T., 5/15/13, at 7. On the third day of the termination hearing, August 7, 2013, she testified with respect to her treatment of Child since the second day of the termination hearing, May 15, 2013. She testified that her appointments with Child occur on the same day that he visits with his biological parents. N.T., 8/7/13, at 26.

Ms. Fair testified that, since the last hearing in May of 2013, Child has become "more angry. He's indicated on several occasions that he's wanted the therapy sessions to be done and the visit to be over so he can go home to his real parents." *Id.* at 27. Moreover, Ms. Fair testified that Child refers to his foster parents as his real parents, and that he is suffering due to his lack of permanency, as follows.

> Q. [C]an you bring us up to date as to the therapy that you are providing to him . . . ?

A. Since the May hearing, I've been seeing him pretty much each week whenever he's had visitation scheduled with his parents. . . .[3]   During the course of that therapy, [Child] has increased his anger level.  He has indicated almost on every appointment that he's come in that he's wanted to return home and would ask where home is. . . .  He has utilized play therapy and has taken objects like the playhouse down and has [taken] out . . . all [of] the furniture, all of the people out of the house, turned it upside down and has said, "I guess I'll just have to live by myself.  I'll have to live alone."

He has begged me to call his foster father and his foster mother for them to come and pick him up and take him home.  One time . . . when he asked me to do that, I said I didn't have his foster parents['] phone number[,] and he said that maybe Lindsay, the person who brought him to the visit[,] had the number[.]  [Child] ask[ed] that I go out to the waiting room with him and we walked out to the waiting room. . . .  [Lindsay] wasn't in the waiting room and [Child] fell to the floor, put his hands on his head and buried his face on the floor and just cried.

When he got up he tried to run out of the waiting room and said he wanted to go to his real mom and dad, [foster mother] and [foster father]. . . .

*Id.* at 24-26; *see also id.* at 41 (Ms. Fair testified that Child "has repeatedly called his real family the foster family whenever I've met with him").

Ms. Fair testified that, "the prolonged confusion for [Child] about where is [his] permanent home is very confusing to him and detrimental to him."  *Id.* at 28.  Indeed, she testified that Child is diagnosed with generalized anxiety disorder due to "his anxiety about leaving his home that he feels safe in with the foster parents."  *Id.* at 33.  As such, Ms. Fair agreed

---

[3] The record reveals that, since January of 2013, Child has been visiting with his biological parents once per week.  N.T., 10/8/13, at 29.

on cross-examination that granting Child a permanent home would help his anxiety and anger issues. *Id.* at 35. However, she testified that, in her opinion, Child's permanent home should not be with his biological parents. Ms. Fair explained that, "I don't believe that it would emotionally have [Child] feel safe and secure if he were placed back with his biological parents since he has identified his foster parents as those who do provide him safety and security." *Id.* at 36-37. Ms. Fair described Child's anxiety with respect to visits with his biological parents as follows on cross-examination by Father's counsel:

> Q. And he never expressed to you . . . that he is afraid or less secure with [Father] or [Mother] for that matter, has he?
>
> A. Yes, he has expressed anxiety. There's a lock on my door. He had locked that door on different occasions and said he did not want to go for a visit [with his biological parents]. He's done that on July 18, he's done that . . . on May 23, he's done that on April 25, he's repeatedly closed the door and not wanted to go on April 4. He's tried to hold the door shut so that the worker couldn't open the door to take him for the visit. And [Child] voiced on April 4 not feeling safe either with the biological mother or father and only feeling safe at [the foster parents'] house.

*Id.* at 43.

In addition, Bobbi Howsare, Child's CYS caseworker since 2010, testified that Child will not be harmed by terminating Father's and Mother's parental rights. She testified as follows.

> [Child] foresees his home and his security, his bond, his placement with his foster parents, as his home. It seems to [Child] that he has people that he visits and he does know that their mom and dad but he doesn't refer to them as mom and

dad anymore. He's stressed by coming to see them. I see more and more stress in him[,] and I feel that he would be more secure with a consistency of just having his family . . . rather than not knowing where he's going to be or what he's doing.

N.T., 5/31/13, at 159. Similarly, Natasha Crissey, the family support specialist from the Alternative Community Resource Program, has been involved with this family since 2011, and she supervises Child's visits with his biological parents. Ms. Crissey described Child's bond with Father like that with an uncle, rather than like that with a parent. N.T., 10/8/13, at 36.

The foregoing testimonial evidence overwhelmingly demonstrates that Child's lack of permanency is having a detrimental effect on his emotional well-being. Child is currently seven years old. He has resided with his foster parents since August of 2012, when he was three years old, and they desire to adopt him. Based on the record evidence, which we have considered in light of our well-established case law, we conclude that Child's permanency is long overdue. As such, we discern no abuse of discretion by the trial court in terminating Father's parental rights pursuant to Section 2511(b). Father's second issue fails. *See In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (stating that, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment").

It follows that we reject Father's third and final issue, wherein he argues that the court abused its discretion in not ordering another bonding study between him and Child. Following our prior disposition, Father requested an updated bonding study, and the trial court held an oral argument on the request on September 24, 2015. *See* N.T., 9/24/15, at 8. Counsel for CYS responded on the record in open court that our prior disposition did not require the trial court to take additional evidence, and that additional evidence would only be necessary if the bonding evaluations were incomplete. *Id.* at 12. Further, counsel for CYS argued that the purpose for this Court's remand was for the trial court to consider "the other factors . . . presented [by] the testimony" in addition to the undisputed "positive bond" between Child and Father. *Id.* at 14. In essence, counsel for CYS argued that the bonding evaluations presented during the termination hearing were sufficient for the trial court to perform a proper Section 2511(b) analysis. *Id.* at 12. The trial court agreed and denied Father's request on the record in open court. *Id.* at 15, 18.

Upon careful review, we discern no abuse of discretion by the trial court in rejecting Father's request for an updated bonding evaluation. Indeed, the testimony of Mr. Kashurba and Ms. Nadenichek, the psychologists who performed separate bonding assessments, was sufficient for the trial court to comply with this Court's directive "to consider and weigh the positive bond it found between the Child and the foster parents, and the

- 14 -

stability and care provided by the foster parents." ***In re G.C.***, _____ A.3d at _____. Moreover, in ***In re K.K.R.-S.***, ***supra***, this Court held that the trial court is not required by statute or precedent to order a formal bonding evaluation be performed by an expert. ***Id.*** at 533. As such, we conclude that the testimony of Child's counselor, Ms. Fair, and his CYS caseworker, Ms. Howsare, was sufficient for the trial court to properly consider and weigh the bond between Child and his foster parents. Father's third issue fails. Accordingly, we affirm the order involuntarily terminating Father's parental rights.

Order affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/11/2016